Patrick D. MALONE, Plaintiff–Appellant,

and

Innovative Real Estate Agency,
Inc., Plaintiff,

v.

Grover L. JOHNSON and Pulaski
Bancshares, Inc., Defendants–
Respondents.

No. 18774.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 16, 1993.

J. Patrick Wheeler, Canton, for plaintiff-appellant.

James L. Thomas, Waynesville, for defendants-respondents.

CROW, Judge.

Two plaintiffs, Patrick D. Malone ("Malone") and Innovative Real Estate Agency,

Inc. ("Innovative"), a Missouri corporation, sued Grover L. Johnson and Pulaski Bancshares, Inc. ("Bancshares"), a Missouri corporation, for a commission allegedly earned by the plaintiffs in finding a buyer for "The State Bank of Dixon." The trial court denied recovery. Malone, alone, appeals. Discussion of his two points relied on is possible only after introducing the drama's main participants.

Malone, a Tennessee resident at time of trial,[1] was a Missouri real estate broker when the saga began. We learn from his testimony that he and his wife, herself a broker, were in the "real estate business" in Camdenton. Malone's testimony:

Q What was the name of the corporation that you were operating under?

A Innovative Real Estate Agency, Incorporated.

Grover L. Johnson, president of State Bank of Dixon at all times pertinent here, was the husband of Bonnie L. Johnson when the relevant events began, but their 37–year marriage was dissolved January 8, 1993, by the Circuit Court of Pulaski County.[2]

Bancshares owns approximately 96 percent of the shares of State Bank of Dixon. According to Grover Johnson, there are 1,143 "outstanding shares" of Bancshares.

The first germane occurrence was February 15, 1991, when a two-page document captioned "EXCLUSIVE AGENCY LISTING" was signed. At that time the document read:

TO: MR. PATRICK D. MALONE

TO: INNOVATIVE REAL ESTATE & INSURANCE AGENCY

. . . .

In consideration of your agreements to list and to endeavor to sell the property described as follows, I, being the owner of such property, hereby give you an exclusive agency to sell such property and confer on you authority to receive and to transmit to me offers to purchase the

---

1. Trial occurred February 17, 1993.

2. According to a separation agreement approved by the dissolution decree, the Johnsons separated August 19, 1991.

property for the price and upon the terms described below.

The property to be listed is described as follows:

[Legal description of land by lot and block] together with the improvements located thereon, the furniture, furnishings, machines and equipment and all real and personal property utilized by and constituting the business known as The State Bank of Dixon.

The price and the terms for the property is [sic] as follows:

The price for the property/stock shall be based upon the bank's book value at the date of closing. The sales price shall be calculated at one and one-half times the book value. The Seller would agree to set up a reserve account on closing for the sum of $200,000.00 for specified loan losses for a period of three (3) years. Any prospective Buyer shall deposit $250,000.00 in escrow to establish that the Buyer is serious before the records of the bank are made available for examination.

I agree to pay you a commission of three percent (3%) of the sales price, if, either (1) you procure a Buyer, who is ready, willing, and able to perform, or (2) you procure a Buyer to whom I do in fact sell or trade the property.

. . . .

Dated: 2–15–91

Pulaski Bancshares, Inc.

: s/Grover Johnson

Grover L. Johnson, owner

### ACCEPTANCE OF EXCLUSIVE LISTING FOR SALE OF THE STATE BANK OF DIXON

I accept the listing for sale of the State Bank of Dixon for the price and upon the terms designated in the attached listing proposal and agree to exercise diligence to achieve its purpose.

Dated: 2–15–91

Innovative Real Estate

& Insurance Agency

By: s/Patrick D. Malone

Patrick D. Malone

The above document appears susceptible to two interpretations: (1) a contract by *Bancshares* to pay a commission if a buyer is found for the shares of *State Bank of Dixon* owned by Bancshares, or (2) a contract by *Grover Johnson* to pay a commission if a buyer is found for the shares of *Bancshares* owned by him.

At trial, the defendants' lawyer argued Grover Johnson, individually, was not a party to the agreement. On that subject, we find the following dialogue in the cross-examination of Malone:

Q ... The listing agreement—who is the listing agreement with? Let me just ask you that. . . .

A With Pulaski Bank Shares, Incorporated [sic], and Grover L. Johnson as owner.

We cannot deduce from that testimony whether Malone embraced interpretation "1" or interpretation "2"—or both!

The agreement is also abstruse as to whom the commission would be due if a buyer were found. On that subject, we discover this in Malone's cross-examination:

Q ... on ... the second page, you have an acceptance of the exclusive listing, is that correct?

A Yes.

Q And that's Innovative Real Estate and Insurance Company [sic], by Patrick D. Malone, is that correct?

A Correct.

Q You did not sign that as an individual, is that correct?

A That's correct.

Q You signed it in your official capacity.

A Yes.

From this, we infer Malone believed the listing was with Innovative, not him personally.

Be that as it may, Malone launched a quest for a buyer. After several months he "come across Don Roth and Don Koch." Discussions ensued between Roth, Koch, Malone and Grover Johnson. Eventually, Roth and

Koch "faxed" Malone a two-page document captioned "PROPOSAL OF INTENT TO PURCHASE."[3]

Malone took the proposal to the bank one afternoon "after 3:00" and discussed it with Grover Johnson. Malone recalled the date as Friday, August 1, 1991.[4] Malone recounted that Grover Johnson "had a secretary that kept running in and out." On several occasions, said Malone, Grover asked the secretary "if Bonnie would agree."

On a date unrevealed by the record, but apparently before Malone delivered the Roth/Koch proposal to Grover Johnson, Malone learned Bonnie Johnson "did have an interest in [Bancshares] and that she ... was also an owner of the property and the bank shares."[5]

Several provisions in the Roth/Koch proposal were unacceptable to Grover Johnson. Malone made notes of them, then returned to his office, had the proposal retyped, and "faxed" a copy of the revised version to Koch.

Malone subsequently received, by facsimile transmission, a new proposal bearing the signatures of Roth and Koch. We henceforth refer to this document as "Exhibit 4," its designation at trial. Three or four days later, Malone presented Exhibit 4 to Grover Johnson. Malone asked Grover to sign it and give it to Bonnie for her signature. Malone quoted Grover as saying he would sign, but he was going to give it to Bonnie first and get her signature. Malone added: "But [Grover] definitely would sign it. We definitely had a deal."

Exhibit 4 identified what was being purchased as: "The State Bank of Dixon, 100% Capital Stock of Pulaski Bancshares, Inc. a Bank Holding Company, which owns 96% Capital Stock of the State Bank of Dixon." Exhibit 4 contained sundry "terms," including:

Seller agrees to finance a part of the purchase price in the amount of 70% of the purchase price to be evidenced by a negotiable purchase money promissory note, over a period of 10 years, amortized over 10 years, bearing interest at Prime tied to Southwest Bank of St. Louis with 7% floor and 10% ceiling. First year, interest shall be paid only. Payable monthly.

. . . .

Buyer agrees to addition to purchase price to give Grover L. Johnson a Consulting Contract for a period of 12 months in the amount of $100,000.00 annual, payable monthly, in exchange for 30 hours monthly. Consulting Contract to begin at date of closing and expire 12 months thereafter. Contingent on satisfactory interview of reviewing loans and conversing with present bank employees on operational matters of the bank and to perform "due diligence".

. . . .

Buyer request that financial audit by a third party accounting firm, be performed prior to closing and approved by Buyers, at Bank cost. Not to exceed $5,000.00. Buyer request during transition period pending approval, any material changes in balance sheet of more than $10,000.00 shall be discussed and approved by Buyers.

. . . .

Buyer agree to deposit escrow money in the amount of $35,000.00 with Innovative Real Estate Agency, Inc., fully refundable if transaction not consummated.

Seller shall agree to signing a no compete agreement with Buyers *terms to be agreed on.* 250 mile radius of Dixon, Missouri for

3. The proposal shows the addresses of Roth and Koch as St. Louis.

4. August 1, 1991, was a Thursday.

5. We cannot divine from the record precisely what Bonnie's ownership was. At one point in his testimony, Malone said Grover Johnson informed him that Bonnie "also owned half shares of [Bancshares]." The Johnsons' separation agreement (footnote 2, *supra*) lists 1,143 shares of Bancshares as marital property and awards

them to Grover. Although not a party to the instant suit, Bonnie testified at trial. Her testimony included this:

Q ... did you ... in your dissolution proceeding dispose of your stock in the Pulaski Bank Shares [sic]? ... Did you transfer your ownership?
A Yes.
Q And to whom did you transfer the ownership?
A To [Grover] Johnson.

a period of 5 years with exception by express written permission of Buyer. (Emphasis added.)

Closing date shall be October 5, 1991 or as soon as possible thereafter all Contingency are met and regulator approval obtained.

Contingent on approval, in writing, by the Missouri Division of Finance allowing the State Bank of Dixon to have a Branch in West St. Louis County.

. . . .

Seller reserves right to Credit Checks on Buyers.

. . . .

If terms of "Proposal of Intent" are accepted, Buyer will move to definitive purchase agree [sic] within 45 days.

Seller agrees to deal exclusively with Buyer during this period, and Buyer and Seller agree to keep all matters in confidence.

A day or two after Grover Johnson received Exhibit 4 from Malone, he (Grover) prepared a paper summarizing the financial implications of the proposed sale. This paper, received in evidence as Exhibit 6 at trial, was delivered to Bonnie, along with Exhibit 4. Exhibit 6 stated, among other things:

These are good people that are buying this. I need to talk to my attorney and accountant and suggest you do the same. Don't feel rushed, but a decision needs to be reached soon. . . . I've given my word that I would sell, provided you feel comfortable and would sell, therefore its [sic] in your hands to make the final decision.

On August 12, 1991, Grover Johnson consulted a certified public accountant, Larry Gray, about the transaction, including tax consequences. Gray's calculations led him to advise Grover that he "could possibly end up not having enough money to satisfy the taxes and the outstanding debt." Gray recommended that Grover not go through with the transaction.

Grover testified that after conferring with Gray, he (Grover) told Bonnie the same day (August 12, 1991) he was not going to sign Exhibit 4. In her testimony, Bonnie confirmed Grover told her he "wouldn't go through with it."

Nonetheless, Bonnie consulted accountant Gray on August 15, 1991. Based on that discussion, she decided not to sell on the terms in Exhibit 4.

While these events were unfolding, Malone was receiving calls from Roth and Koch "trying to get on with this thing." Malone ultimately contacted Bonnie Johnson, evidently by phone.

Bonnie testified she told Malone the proposal in Exhibit 4 "would not work." It called for a price of "[o]ne times book value." Bonnie avowed: "I told [Malone] . . . I wanted book and a half . . . And that there was several things not right with it and there would be things that I would . . . want in a contract." Her testimony continued:

Q  Did [Malone] make any representations or statements to you concerning this agreement?

A  Yes. He said this was just to show the buyers that I would work with them. . . . He was afraid he was going to lose the buyers, he told me.

Q  Was it your understanding then that there would be other contracts that would come after this?

A  Definitely. There was many, many things to go into a contract.

. . . .

Q  Was there a discussion whether or not Mr. Malone would get any sales commission as a result of you signing [Exhibit 4]?

A  I asked Mr. Malone if we would owe any commission if I signed this, and he said no.

Q  And why would you not owe any commission if you signed this?

A  Because this was not a contract. It was not binding. It was not—we had—Grover had to work up what he wanted to go into the contract. I had to work up what I wanted to go into the contract. And it had to go into a finished contract and be approved by everybody. It was not finished.

After her discussion with Malone, Bonnie signed Exhibit 4 and "faxed" a copy, bearing

her signature, to his office.[6] Bonnie testified she did this August 16, 1991; the "faxed" copy shows it was transmitted that date.

Malone testified he went to the bank the following Monday[7] and showed Grover Johnson Exhibit 4 bearing Bonnie's signature. According to Malone, Grover summoned Bonnie and there was a "short discussion." Bonnie then departed. Malone quoted Grover as saying, "Well, I will sign this document."

Sometime after the meeting, Malone received a letter from Grover dated August 19, 1991. It read, in pertinent part:

> ... I will be unable to accept the proposal to purchase Pulaski Bancshares submitted by Don Koch and Don Roth.
>
> After discussing this contract with my accountant, it is not feasible to create the tax liability which we would have, therefore having to sell other assets to pay this. Other reasons have been pointed out also, but they do not have the impact the tax liability does, which has given me sufficient reason not to accept this drafted contract. Should you like, you can continue to sell Pulaski Bancshares on the terms and conditions as outlined in our contract of February 15, 1991.

On September 23, 1991, Malone sent Grover Johnson a letter demanding a $135,000 commission. The letter asserted the sale failed solely because Grover decided the tax liability would be too great.

The demand was futile, and this suit followed. Bonnie was not named a defendant.[8]

At trial, an affidavit of Don Koch was received in evidence. No error is assigned in this appeal regarding its admission. Koch's affidavit states, among other things, that he is a ready, willing and able purchaser; that Exhibit 4 was not a final, binding contract, nor was it intended to be, but rather was the first phase of negotiations which may or may not have led to a final contract; that Exhibit 4 was incomplete as to significant material items, including the drafting of a promissory note and security agreement, the drafting of an escrow agreement and selection of an escrow agent, the drafting and execution of a covenant not to compete, the drafting of the consulting contract for Grover Johnson, and other items.

At trial, Malone revealed he was no longer engaged in real estate. His testimony:

> Q  What did you do with your real estate business?
>
> A  I sold the real estate business.
>
> Q  And when was it that you sold the real estate business?
>
> A  December 4th of 1992.

Despite this, Innovative remained a party, in name, throughout the trial. The defendants did not question whether Innovative was still a real party in interest.

Malone's lawyer submitted proposed findings of fact, conclusions of law, and a judgment to the trial court. In that document, there is a proposed finding that the listing agreement granted an exclusive listing "to the broker Malone." Elsewhere, there is this: "The Plaintiff is entitled to judgment." The document ends with a paragraph that would grant a $135,000 judgment, plus interest, to both Malone and Innovative.

The notice of appeal is signed by Malone's lawyer and follows Form No. 8–B, Missouri Rules of Court (1993), pp. 373–74. The notice states, "Plaintiff, Patrick D. Malone, appeals...." No appellant except Malone is named in it. We are left to speculate whether Malone's lawyer—if he still represented Innovative when he signed the notice of appeal—intended that Innovative be an appellant.

Missouri case law supplies scant guidance for us in these circumstances. There is a

---

**6.**  A copy of Exhibit 4 bearing Bonnie's signature was received in evidence at trial as Exhibit 5. Because Exhibits 4 and 5 are identical except that the latter has Bonnie's signature, we continue to refer to the instrument as Exhibit 4.

**7.**  That would have been August 19, 1991.

**8.**  On August 21, 1991, Bonnie signed the "Exclusive Agency Listing" (the document of February 15, 1991, described early in this opinion). Why she did is unexplained, but it is inferable she was still hoping Malone could find a buyer willing to pay "one and one-half times the book value," the price specified in the listing.

holding of this Court, *Government Employees Insurance Co., Inc. v. Clenny*, 752 S.W.2d 66 (Mo.App.S.D.1988), where an entity identifying itself as an "adjusting agent" for an insurance company filed a notice of appeal from a judgment that might possibly have adversely affected the insurance company. This Court held that where a principal is a party to a lawsuit, Rule 81.04(a) allows the principal's agent to appeal for the principal in the principal's name, but not in the agent's name. 752 S.W.2d at 68[4]. The rule does not allow an appeal in the agent's name from a judgment that could affect the principal. *Id.*

Here, Malone does not identify himself in the notice of appeal as agent for Innovative and, as reported *supra*, Innovative's name does not appear on the notice of appeal. Were it necessary to decide the question, we would be inclined to hold Innovative is not an appellant. That would be consistent with *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), applying Federal Rule of Appellate Procedure 3(c); *Stewart Properties, Inc. v. Brennan*, 8 Hawaii App. 431, 807 P.2d 606 (1991), applying Hawaii Rule of Appellate Procedure 3(c); *Cummings v. City Council of Gloucester*, 28 Mass.App.Ct. 345, 551 N.E.2d 46 (1990), *review denied*, 407 Mass. 1102, 554 N.E.2d 851 (1990), applying Massachusetts Rule of Appellate Procedure 3(c). That is the reason we, in the title of this case and the first paragraph of this opinion, have identified Malone as the sole appellant.

However, inasmuch as we have determined, for reasons appearing *infra*, that this appeal is meritless—thereby leaving the trial court's judgment intact—it is unnecessary to decide whether Innovative is an appellant. For convenience, we shall assume, without deciding, that Malone is the only appellant.

The trial court found Malone never located a buyer willing to purchase the property on the terms specified in the listing agreement of February 15, 1991. That finding is firmly supported by the evidence, and Malone does not argue otherwise.

The trial court then noted that Grover Johnson, upon receiving Exhibit 4 from Malone, submitted it to Bonnie Johnson along with the statement that he (Grover) had given en his word that he would sell. This, said the trial court, raised the question whether Malone had found a buyer ready, willing and able to purchase the property upon terms accepted by Grover Johnson. On that issue, the trial court found:

> I think not. While [it] is true that Plt was the means of bringing the parties together and opening negotiations, the evidence is clear that the negotiations were unproductive and [Grover Johnson] in good faith withdrew therefrom and abandoned the proposed purchase and sale. There were material terms of the sale not agreed to.
>
> . . . .
>
> In summary, Plt procured buyers ready, willing and able to NEGOTIATE for the purchase and sale of the property. Defs were not contractually obligated to pay a commission to Plt for that.

Malone's brief presents two points relied on, the first of which reads:

> The Trial Court erred and the judgment . . . should be reversed because the judgment entered erroneously declares and applies existing law in that there were admissions and stipulations that a Buyer, ready, willing and able to buy was produced by the real estate agent, Plaintiff/Appellant, which entitled the agent to a commission irrespective of the completion of the sale.

The applicable law appears in *Meridian Interests, Inc. v. J.A. Peterson Enterprises, Inc.*, 693 S.W.2d 179 (Mo.App.W.D.1985), cited by Malone:

> The general rule is that a broker earns his commission when he produces a buyer ready, willing and able to buy on terms specified by the seller, whether or not the sale is completed. *Marrs v. Twitty*, 635 S.W.2d 374, 376 (Mo.App.1982); *E.A. Mabes and Co. v. Fishman*, 284 S.W.2d 21, 26 (Mo.App.1955). . . .

The seller is liable for his broker's commission when a purchaser is willing to buy on the seller's terms or on terms agreeable to the seller. *Tant v. Gee*, 348 Mo. 633, 154 S.W.2d 745, 747 (1941). . . .

*Meridian Interests, Inc.,* 693 S.W.2d at 182[3] and [5].

Inasmuch as Malone never produced a buyer willing to purchase on the terms in the listing agreement of February 15, 1991, his— or Innovative's—entitlement to a commission hinged on whether Roth and Koch were willing to purchase on terms agreeable to Grover and Bonnie Johnson.

By Exhibit 4, Roth and Koch proposed to buy 100 percent of Bancshares. Nothing in the record indicates they would have bought anything less than 100 percent. Although, as observed earlier, Bonnie's interest in Bancshares is not precisely shown by the record, it is evident her interest was such that no sale of 100 percent of Bancshares could occur unless the terms were acceptable to her. That is, Roth and Koch could not purchase 100 percent of Bancshares from Grover Johnson alone, as he did not own 100 percent.

It is clear from Bonnie Johnson's testimony (quoted *supra*) that the terms in Exhibit 4 were unacceptable to her. She testified she signed Exhibit 4 only because Malone told her its sole purpose was to show Roth and Koch that she "would work with them." Bonnie avowed Malone assured her that she would not owe him a commission if she signed Exhibit 4.

The trial court obviously believed Bonnie's testimony. The trial court found:

> ... Plt persuaded Mrs. Johnson to execute the revised Proposal of Intent to Purchase and the listing agreement. The Court finds that such acts were induced by Plt, not in furtherance of the negotiating process, but rather to protect Plt's interests; that there was no agreement between Plt and Mrs. Johnson and that such acts were a nullity.

It was the trial court's prerogative to accept Bonnie's testimony as true. In this judge-tried case, credibility of witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe none, part, or all of the testimony of any witness. *Herbert v. Harl,* 757 S.W.2d 585, 587[1] (Mo. banc 1988).

As we have seen, Bonnie Johnson testified she told Malone she wanted "book [value] and a half" for her interest in Bancshares. The price proposed by Roth and Koch in Exhibit 4 was: "One times book value as of closing date." The record is bare of any indication that Bonnie would have accepted that price.

Furthermore, it is manifest there were other unresolved issues when Grover Johnson balked at signing Exhibit 4. Some are identified in Koch's affidavit, mentioned earlier, including the drafting of a promissory note and security agreement, the drafting of an escrow agreement and selection of an escrow agent, the drafting and execution of a covenant not to compete, and the drafting and execution of the consulting contract for Grover Johnson.

Consequently, it is obvious that no agreement for the sale had been reached when Grover Johnson backed away from further negotiations after consulting accountant Gray. Exhibit 4 itself provided that if its terms were acceptable, the buyers would move to a definitive purchase agreement. That provision illustrates there were terms and conditions yet to be negotiated by the parties before a contract of sale could be drafted and signed. Indeed, Koch's affidavit declares Exhibit 4 was not "a final binding contract," but merely the first phase of negotiations which may or may not have led to a contract. Accordingly, even had Grover Johnson signed Exhibit 4, there was no assurance that Roth and Koch would have ultimately agreed to terms acceptable to Grover and Bonnie Johnson.

As reported earlier, the trial court found "Plt" [9] procured buyers ready, willing and able to *negotiate* for the purchase of Bancshares, but no commission was due for that.

Our review of this court-tried case is governed by Rule 73.01(c), Missouri Rules of Civil Procedure (1993), as construed by *Murphy v. Carron,* 536 S.W.2d 30, 32[1] (Mo. banc 1976). The judgment will be sustained

---

9. In its findings, the trial court uses "Plt" interchangeably with the pronoun "he." We infer the trial court intended "Plt" to mean Malone, not Innovative.

unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

We hold the evidence heretofore discussed was ample to support the trial court's finding that no agreement for the sale of 100 percent of Bancshares was ever reached by Roth, Koch, Grover Johnson and Bonnie Johnson. While it is true that Grover's repudiation of Exhibit 4 brought negotiations to an end, we cannot assume an agreement on all unresolved issues would have been reached by all members of the quartet had negotiations continued.

Malone's first point is based on the assumption that he found a buyer ready, willing and able to buy on terms agreeable to Grover Johnson and Bonnie Johnson. The trial court found otherwise, and that finding is solidly supported by the evidence. Malone's first point is denied.

Malone's second point, like his first, is based on the premise that he found a buyer ready, willing and able to purchase on terms acceptable to the Johnsons. Having rejected that premise in denying Malone's first point, we likewise deny his second.

Finding no merit in either of Malone's assignments of error, we uphold the judgment. That makes it unnecessary to decide whether, had a commission been earned, it would have been owed to Malone or Innovative.

Judgment affirmed.

FLANIGAN, P.J., and GARRISON, J., concur.